### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ADRIAN GRIFFIN,                                    :

                                            :      **Case No.:**

                    **Plaintiff,**                   :

                                            :      **<u>COMPLAINT</u>**

          **-against-**                        :

                                            :

AUDREY R. STERLING,                                :

                                            :

                    **Defendant.**                  :

-------------------------------------------------------------------X

Plaintiff Adrian Griffin ("Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

### <u>INTRODUCTION TO THE ACTION</u>

1.  Adrian Griffin is currently the lead assistant coach of the NBA's Toronto Raptors. What comes next in his career could and should be fabulous, as descriptions like the below are commonplace among basketball people in the know who track future head coaching candidates:

> Adrian Griffin is probably the hottest name on the coaching market right now. Griffin commands respect for his playing career and for his work as a development coach. Griffin has earned rave reviews for this aspect of his coaching wherever he has travelled in the league.

See "The Head Coach candidates: who should the Thunder select to lead the franchise forward?" https://www.welcometoloudcity.com/2020/9/22/21447107/the-head-coach-candidates-who-should-the-thunder-select-to-lead-the-franchise-forward.    Plaintiff's decades of hard work, sacrifice and consistent excellence warrant such a bright, successful future.  Unfortunately, tomorrow is not promised and, alternatively, the future could be far less rosy, both for the Coach's career prospects and even his current station.  If his ex-wife has her way, and continues to pursue

a Twitter #MeToo campaign to both extort and destroy him, then Coach Griffin will continue to struggle in his pursuit of the top spot, his dream job.

2.      Plaintiff Adrian Griffin brings this libel action as the victim of a vicious campaign of lies by the Defendant, his ex-wife, Audrey R. Sterling.  The subject attack was launched by a Tweet on August 13, 2020, in which Defendant falsely accused Plaintiff of failure to pay child support and vivid accusations of horrifying physical abuse by Plaintiff. These were all lies, completely fabricated to take advantage of the current online climate where a woman's unsupported accusation would be inherently believed, no matter how false or far-fetched.  In today's lost cancel culture, where angry mobs patrol the bowels of social media ready to pounce, an accusation, with or without evidence, is the equivalent of a conviction. Sterling knew her accusations to be false. She made them anyway, and persisted in making them, until her thirst for blood was quenched.

3.      Defendant's primary purpose soon revealed itself, however.  As her former NBA player husband, now a highly regarded lead assistant coach, developed into an exceptional candidate for multiple head coaching positions in the NBA in recent years, Sterling wanted her piece of the pie.  She would use whatever she could get away with to get it.  Either that or she would destroy him, knowing no one would challenge her lies about an athlete's alleged abuses.

4.      Plaintiff and Defendant were married on September 4, 1996 and remained married for nineteen years until they filed for divorce in 2015. They had four wonderful children.  Despite Plaintiff's extensive work-related travel as a player and coach, Plaintiff has always been, and will always be, a dedicated, loving father, even in the later years when he and Defendant grew apart. Yet, defendant dragged her own children, too, into her Twitter lies.

5.      This matter is about Defendant's deliberate attack on Plaintiff's hard-earned career,

impeccable reputation and exceedingly good name, with outrageous accusations of fictional abuse and provably false claims of unpaid child support.  Defendant was armed with her Twitter account, and a willingness to spread these lies of abhorrent, criminal abuse specifically to hurt Plaintiff and undermine his career.

6.      Defendant's Twitter jihad against Plaintiff in August 2020, was nothing more than another attempted shake-down of the loving father of her children, enabled by an online atmosphere that presumed any accusation to be true without regard for how outrageous and/or false it was.  There was no need for proof:  a bald accusation was enough to do irrevocable damage. Plaintiff could either pay off his ex-wife to end her campaign of lies, or see his career destroyed. Sterling may have preferred the cash, but she would settle for ruining her ex-husband's life and career.  Either way, she had him right where she wanted, and all it took was the shameless will to lie on Twitter and beyond.  Defendant was more than willing.

## PARTIES

7.      Plaintiff Adrian Griffin is a resident of Champaign, Illinois.

8.      Defendant Audrey R. Sterling, formerly Griffin ("Defendant"), is a resident of Westchester County, New York.

## JURISDICTION AND VENUE

9.      This Court has diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

10.      This Court has personal jurisdiction over Defendant on the grounds that Defendant, Audrey R. Sterling, formerly Griffin, resides in Westchester County, in the Southern District of New York.

11.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district with Defendant Audrey Sterling publishing her libelous communications while residing in this judicial district.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

**A.      Plaintiff's Rise to Head Coaching Candidate**

12.     Plaintiff is currently the lead assistant coach for the Toronto Raptors, and served in said role in 2019, when the Raptors won the NBA championship.

13.     Plaintiff has been a highly respected assistant coach in the league for years and widely believed to be a top candidate for the exclusive position of head coach for an NBA franchise, particularly the past few years.

14.     Plaintiff, the proud son of a minister from Wichita, Kansas, developed his reputation as a hard-working leader, an elite, defensive-minded strategist with an innate ability to develop trust and build lasting relationships with his players, throughout an admirable professional basketball career spanning over twenty-five years.

15.     Plaintiff played professionally, including a nine-year stint in the NBA, before beginning his storied coaching career, in which he was mentored by some of the game's best head coaches in Milwaukee, Chicago, Orlando, Oklahoma City and with his current position in Toronto.

16.     Of the five teams he coached over the past 12 seasons, four of those five teams had a top-ten defense during Plaintiff's tenure as an assistant coach, with his most recent work in Toronto contributing to the aforementioned championship effort.

17.     Plaintiff is currently viewed in his industry as a top candidate to fill one of the few vacancies of the highly coveted head coaching positions which become available each year.

Plaintiff has been a viable candidate for these highly competitive jobs because he is highly qualified and enjoys numerous close personal relationships with executives from various teams, prominent media members and people throughout the professional basketball community.

18.     When married to Plaintiff, Defendant served as Vice President of Behind the Bench: The National Basketball Wives Association; she relished the cache that came with being married to an NBA player, and often capitalized on said status to promote her writing career, described further below.

**B.     Defendant's Interference in Plaintiff's Life and Career:  Defamatory Tweets**

19.     Defendant is well-aware of Plaintiff's relationships with executives around the league as well as the coaching vacancies Plaintiff has coveted in recent years.

20.     Defendant is also acutely aware of Plaintiff's methodical climb up the coaching ranks, well-earned reputation and the opportunities as they become available to Defendant.

21.     On August 12, 2020, Plaintiff coached his first game as head coach for his current team, filling in for the current head coach for the night.

22.     Plaintiff led his team to a dramatic comeback win, from 16 points down, over the rival Philadelphia 76ers; Plaintiff was immediately showered with praise and admiration from his players, and fellow coaches.

23.     Plaintiff, for his part, was moved by the love and recognition from his championship team.  After revealing the sanctity of his bond with the players, referring to them as brothers, and the mutual admiration and respect, Plaintiff stated, "Honestly, for one night, I felt like Cinderella.  I had the glass slippers on, and it was great.  Tomorrow, it's back to reality, but it was an awesome feeling."

24.     As moving as the sentiment was, for a man who has sacrificed much to get to this

lofty position, including the painful hours upon hours away from his four children whom he adores, the statement was also strangely prescient, because reality would indeed rob Cinderella of the "glass slipper" the very next day.

25.     The day after Plaintiff enjoyed a career milestone, on August 13, 2020, Defendant, utilized her Twitter handle, @sincerelyaud_, to publish the following statement:

> How can someone tell their child to hate another parent?  How can someone not follow court order and continue life as normal?  How can someone not send support but then send a $200 Visa card to their child so they can eat for a few days?  How can someone continuously get away with abuse, almost take a life choking them while on the floor and almost passes out, throw them into a wall making a hole as big as their body, drag them across a lawn while pregnant, drag them out of the house in their pj's in zero below weather while their child holds their feet and the other children run away in fear then locking them out of the house and the child lets them in when they go to sleep, choke them holding them against a wall while their feet are off the ground, throw a 4ft  ceramic vase at them that shatters an entire door glass panel, breaks down locked doors to get to them, gives them STD's, sleeps with prostitutes, sleeps with a teen age ball girl???  And even though you have receipts for EVERYTHING!!!!  How an you do ALL of this and still get away with it???  I will tell you how… just be in the NBA and win a game in the bubble.  Cinderfella.  That's how.  Simple.

26.     The statement was posted without restriction, from Defendant's public Twitter account and was accompanied by the defamatory question "How can someone do ALL of this and get away with it…"

27.     Additionally, on the aforementioned defamatory post (entire defamatory post hereinafter referred to as the "August 13th Tweet"), Defendant "tagged"[1] a number of NBA reporters, including national NBA reporters, reporters for the Bulls and Raptors, respectively, as well as the league's @nba Twitter handle and the @raptors Twitter handle in a blatant attempt to damage Plaintiff's career.

28.     Finally, in order to clearly identify Plaintiff as the alleged culprit of the

---

[1] By "tagging" a Twitter account's Twitter handle, it ensures the individual or entity running the account will see the Tweet-message when they log onto their Twitter account.

aforementioned defamatory allegations, Defendant included #AdrianGriffin, on the libelous post.

29.     A review of Defendant's Twitter account reveals further false allegations of physical abuse by Plaintiff, some veiled and others directly implicating Plaintiff, including a post by Defendant one day after the August 13th Tweet, on August 14, 2020, in which Defendant posted the following false allegation to her same Twitter account:

> I spent 22+ years keeping the abuse under wraps.  I've lived within the realm of the nba for 20+ years.  There is no desire for clout from me.  Before breaking my silence I privately went to the NBA and the Raptors in October and November of 2019 about my ex-husband continual abuse and nothing was done.  But enough is enough.  Everyone has their breaking point, and with his recent actions I had to come forward.

30.     This defamatory Tweet, (hereinafter referred to as the "August 14th Tweet"), was accompanied by other Tweets on Defendant's timeline, and on other social media platforms, in which Defendant alleges that Plaintiff was either physically abusive of Defendant, and the Parties' children, or accusing Plaintiff of not supporting his children financially.

31.     The allegations of physical abuse by Defendant, as described further below, are wholly defamatory as Plaintiff has never physically assaulted Defendant or the Parties' children.

32.     The allegations of failure to pay child support, range from intentionally misleading to grossly defamatory, as was the case with the August 13th Tweet in which Defendant published the false statement, "*How can someone not send support but then send a $200 Visa card to their child so they can eat for a few days?"*

33.     As described further below, Plaintiff has never missed a child support payment, and has always paid child support in an amount exceeding the amount required by statute in Illinois.

34.     Further, the Parties', since the dissolution of their marriage on January 29, 2016, have had multiple disputes over money allegedly owed to Defendant.

35.     Unfortunately, since the Parties' divorce proceedings began, in 2015, Defendant

has harbored an extreme hatred towards Plaintiff, in addition to an undying thirst to sabotage Plaintiff's career, ruin Plaintiff's life, in general, and make Plaintiff miserable as often as possible.

36.     Upon information and belief, from Defendant's words and actions, a tremendous source of animus on the part of Defendant is the fact Plaintiff has found true love, and a healthy marriage, with his current wife.

37.     As noted by Defendant in the August 14th Tweet, she has repeatedly attempted to prevent Plaintiff's career advancement by contacting organizations who hired Plaintiff and uttering the same baseless allegations of domestic violence and other false attacks of Plaintiff's character.

38.     Most recently, in late September 2020, Defendant contacted Plaintiff's current employer to falsely accuse Plaintiff of kidnapping their youngest son, then 17-years-old, who came to stay with Plaintiff, and his current wife, voluntarily.

39.     Defendant's allegations of abuse, failure to pay child support and kidnapping are all completely false and have only been lodged against Plaintiff over the last year, as he gets close to reaching his life's career goal of becoming a head coach of an NBA team.  To add to Defendant's ire, Plaintiff maintains a healthy, loving relationship with his current wife with unapologetic admiration of his four children, and the impressive adults they have all become.

40.     Defendant's defamatory attacks, in particular the August 13th and August 14th Tweets, were clearly aimed at preventing Plaintiff from pursuing job opportunities he earned.

41.     The attacks were also ultimately about money, lodged in retaliation to Plaintiff's attempts to pay the legally appropriate amount of support to Defendant, as described further below, and in an effort by Defendant to promote sales of her, at the time, new book

**C.     Defendant's Quest for "Clout" in Publishing**

42.     Defendant published her second book, *F.L.Y. Fully Love Yourself* ("F.L.Y."), on

April 20, 2020, in which she masks the defamatory allegations of physical abuse about Plaintiff through poetry.  The allegations of physical abuse in F.L.Y., mirror the vivid, yet completely false accusations included in the August 13th Tweet.

43.     Defendant promoted *F.L.Y.* on the same Twitter account with which she defamed Plaintiff, on or about and between April 20, 2020, and May 20, 2020, when she began to post veiled attacks towards Plaintiff, so her August 13 and August 14 Tweets also aimed to bring eyes to her Twitter timeline where a user could purchase F.L.Y. through a link.

44.     The false allegations of physical abuse were initially published in May of 2020, after a month of minimal book sales, limited public attention and a lack of critical acclaim.

45.     Defendant's claims, as in the August 14th Tweet, that she harbors "no desire for clout" are, much like the false allegations of domestic violence, difficult to believe given the last 20+ years of evidence.

46.     As noted above, F.L.Y. is Defendant's second book.  Prior to her book of poetry, she published a book entitled *The Day I Took Off My Cape: An NBA Wife's Journey to Finding Family Balance*, on January 25, 2010.

47.     In her first book, Defendant provides advice on child rearing, healthy marriages, parenting, and sex.  The book contained similar content to Defendant's lifestyle parenting blog *Removing the Cape*, where Defendant advised others on how to find the "balance" she, Plaintiff and their family enjoyed.

48.     During this balanced time, Defendant also provided family advice, such as the "secret for a healthy marriage" to *blackdoctor.org* and praised both Plaintiff's support and their family's quest for work-life balance on *ebony.com*.

D.      **Prior Litigation Among the Parties**

49.     The *per se* defamatory allegations of domestic violence, physical abuse, choking, endangering the welfare of the Parties' children, within the August 13th Tweet, and F.L.Y., were never mentioned by Defendant, at any point, during the divorce proceedings in 2015.

50.     The absence of such allegations in the divorce proceeding speaks volumes.

51.     Defendant's claims of physical spousal abuse, physical child abuse and lack of financial support are also undermined by the Parties' children.

52.     The Parties' oldest daughter condemned her mother's August 2020 attacks, Defendant's, "lies", and offered support for her father, on her social media days after August 13th:

> I see that my mother's story of lies has caught your eye.  Please stay blessed and highly favored, not all you read on the internet is true…I have been dealing with my mother's shenanigans for years now.  Constantly having her back even when she's in the wrong, I have always stuck up for her.  In fear that every time my dad left on the road my life would be hell…I am grateful and beyond blessed.  I could not have asked for a better father, dad, mentor spiritual guider.  [Plaintiff's social media handle] you did one heck of a job raising me as a father and I hope you know I am proud to call you my father.

53.     The Parties' oldest son, in addition to affirming Defendant was "wrong" in the August 13th Tweet, also shared "the truth" about his father on social media in August 2020:

> I'm not here to choose sides I'm here to speak the truth about my father.  My father has never told any of us to hate our mother.  My father has payed child support for over the past 5-6 years.  My father has never done anything to harm us children.  He has always been a father to us children no matter what.  From the time we were kids and now as young adults he has never been abusive towards any of us.  All he wants from his children is for us to do things the right way.  My father is a hard-working man.  It runs in the family as all of us GRIFFINS are.

54.     Prior to commenting on Defendant's false allegations, the Parties' two oldest children also shared congratulations and pride for their father after Plaintiff secured his first head-coaching win for the Raptors on August 12, 2020.  Each child posted "I am proud of my father" and shared their admiration for his hard work and deserved success.

55.     The unprovoked support of his children means the world to Plaintiff, and, rather convincingly, dispels the hateful, false allegations hurled by Defendant in the August 13th Tweet, August 14th Tweet and her recent writings.

E.     **Proof of Financial Support**

56.     Defendant's claims of Plaintiff's failure to provide financial support to his children are also false and made only to both harm Plaintiff's career and illicit more money for Defendant.

57.     Despite the Dissolution of Marriage and Uniform Child Support Order, entered January 29, 2016, the Parties' remained engaged in litigation over the amount of support owed by Plaintiff until April 5, 2021.

58.     Contrary to Defendant's claims Plaintiff has made child support payments, in excess of what he was statutorily required to pay, consistently on a monthly basis; he paid child support for two of his children into college as well.

59.     Plaintiff, in fact, overpaid the amount statutorily required for his two middle children, between June 20, 2018 and November 6, 2019, by $82,698.00.

60.     Plaintiff overpaid the amount statutorily required for his youngest child, since November 6, 2019 by at least $21,025.50.

61.     In total, Plaintiff overpaid child support by at least $110,946.00.

62.     On April 5, 2021, the Parties agreed to finally settle the support litigation as Plaintiff agreed to waive his right to this six-figure overpayment of child support obligations.

63.     In August 2020, Defendant was aware that both her maintenance payments, and the aforementioned child support payments, would soon cease.

64.     Defendant was angered by Plaintiff's attempt to terminate his maintenance payments to her, due to Defendant's living with her boyfriend.  Defendant would later marry said

boyfriend on April 28, 2021.

65.    In the months immediately preceding the instant suit's filing, during the 2021 offseason, Plaintiff was unable to secure yet another head coaching position specifically because of, he was told, Defendant's defamatory attacks.  Plaintiff contacted Defendant in an attempt to peacefully request Defendant refrain from the false accusations and social media drama.  Plaintiff urged Defendant to consider the Parties' children, the effect her lies had on his career and his ability to further support their four children.  Defendant, revealing the primary motivation behind her libelous attacks, told Plaintiff he would have to pay her $500,000.00 to secure the peace he sought for his family, and their shared children.

## PLAINTIFF'S DAMAGES

66.    As a direct and proximate result of Defendant's defamation of Plaintiff, he has sustained damages to his reputation and good name, as well as irrefutable damage to his career. Plaintiff was a leading candidate for multiple head coaching positions in recent offseasons.  He would have obtained said head coaching positions, he was informed, if not for the publicized attacks by Defendant described herein.  Defendant's defamation has therefore proximately caused the loss of millions of dollars in income for Plaintiff, as well as future loss of earnings, loss of job opportunities, an inability to secure his dream job as an NBA head coach.

67.    As a direct and proximate result of Defendant's conduct described herein, Plaintiff sustained damages, including, without limitation, pain, suffering and extreme emotional distress as described above, as well as loss of earnings, loss of opportunity and other career-related losses due to the defamatory allegations, and related economic injuries and other direct and consequential damages.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Defamation of Character by Libel)

68.     Plaintiff repeats and realleges each and every allegation above as if fully forth herein.

69.     The defamatory allegations published by Defendant, on social media and elsewhere are motivated by Defendant's jealousy towards Plaintiff, her desire to ruin his career and her own financial interests, including a desire to sell more books and further extract money from Plaintiff by any means necessary.

70.     Throughout this course of defamatory conduct, Defendant acted at all relevant times with actual malice, knowing the published accusations of criminality, domestic violence, failure to pay child support and kidnapping, were all false.

71.     Actual malice exists when a defendant publishes a defamatory statement with knowledge that the statement is false or with reckless disregard for its truth or falsity.

72.     Actual malice through knowing falsehood exists where a story was "fabricated by the defendant" himself or herself.  St. Amant v. Thomson, 390 U.S. 727, 732 (1968).

73.     Defendant posted the August 13th Tweet and the August 14th Tweet with knowledge that the allegations, of physical abuse and that Plaintiff does not pay child support for his children, were false.

74.     The August 13, 2020, Tweet published by Defendant, on her public Twitter account page, @sincerelyaud_, contained the following false statements:

a.)     How can someone not follow a court order and continue life as normal?

b.)     How can someone not send support but then send a $200 Visa card to their child so they can eat for a few days?

c.)     How can someone continuously get away with abuse, almost take a life choking them while on the floor and almost passes out, throw them into a

wall making a hole as big as their body, drag them across a lawn while pregnant, drag them out of the house in their pj's in zero below weather while their child holds their feet and the other children run away in fear then locking them out of the house and the child lets them in when they go to sleep, choke them holding them against a wall while their feet are off the ground, throw a 4ft ceramic vase at them that shatters an entire door glass panel, breaks down locked doors to get to them ...

75.     The first two statements in the immediately preceding paragraph, Paragraph 74 (a)-(b), are false statements in which Defendant is accusing Plaintiff of failing to pay child support, in contempt of a Court Order, a crime that cuts directly to the heart of Plaintiff's integrity.

76.     As established above, Defendant knew the above statement regarding failing to pay child support statements were false as, Plaintiff overpaid child support by at least $110,946.00 to Defendant for their children.  The payments were made in accordance with the Court's directives.

77.     The third statement, in Paragraph 74(c), contains vivid, yet totally false, descriptions of physical abuse of Defendant by Plaintiff.  Defendant knows the domestic violence allegations, choking, throwing into wall, and dragging across the floor while pregnant in front of the parties' children, are false as she is the one fabricating the lies.  Further, as noted above, the Parties' children posted public statements in defense of their father, Plaintiff, rejecting Defendant's false statements and 'shenanigans.'

78.     The false statements posted by Defendant on her public Twitter page on August 13, 2020, were purported factual statements about Plaintiff as Defendant reposted the statements with the question "How can someone do ALL of this and get away with it…", in a Tweet which also contained the #AdrianGriffin hashtag and tagged reporters from the NBA, including a reporter who covered Plaintiff's current team as well as a team that, Defendant knew, Plaintiff would be interviewing with.  The August 13th Tweet also referenced the "Cinderella" comment made by Plaintiff the night before as a further means of identifying him.

79.     Defendant, in her Tweet dated August 13, 2020, libeled Plaintiff with non-privileged defamatory false statements of fact that were culpably published and damaging:

a.)     The specific statements accusing Plaintiff of failing to pay child support and letting his child go hungry (Paragraph 74(a)-(b)), and of vivid physical abuse, amounting to domestic violence (Paragraph 74(c)), are factual: the language used and the context in which that language appears makes clear that Defendant is factually accusing Plaintiff of failing to pay child support, in contempt of a Court Order, and committing domestic violence physically abusing her, choking her, throwing her into a wall and dragging her on the floor in front of their children.

b.)     The aforesaid purported factual statements were false.  Plaintiff paid child support as directed by the Court that handled the Parties' dissolution of marriage, as evidenced and discussed herein, and Plaintiff never physically abused Defendant as evidenced by her first book outlining their loving, balanced marriage, and the Parties' children immediately coming to his defense on social media after the Defendant's libelous Tweets on August 13, 2020 and August 14, 2020.

c.)     The aforesaid factual accusations are defamatory *per se* against Plaintiff in his capacity as a husband, father and coach, as such behavior would not only subject the person to public contempt, aversion, disgrace, induce an evil opinion in the minds of right thinking persons and deprive the person of friendly intercourse in society, but also were defamatory concerning Plaintiff in his performance of his trade and profession as a coach, who is supposed to serve as a mentor and role model to young people, as the face of a billion-dollar sports team.

d.)     The aforesaid defamatory and false statements were not privileged, as the communications were not made in the kind of circumstances in which an absolute protection applies or in which it was necessary or appropriate to make those communications subject to a qualified privilege.

e.)     The aforesaid non-privileged, defamatory and false statements were culpably uttered.  The statements that Plaintiff failed to pay child support and abused Defendant were made knowing they were false, maliciously and with gross irresponsibility.

f.)     The aforesaid non-privileged, defamatory, false and culpably uttered statements were damaging to Plaintiff's abilities to earn a living as a head coach as he was unable to secure the positions he interviewed for and/or otherwise pursued.

80.     The false allegations in the August 13, 2020 Tweet, as well as those within the

August 14, 2020 Tweet, Defendant's other veiled social media posts and the recently released F.L.Y., are directly fabricated by Defendant, herself.

81.    Insofar as she published defamatory statements with knowledge that they were false, Defendant acted with actual malice.

82.    Defendant's allegations, within the August 13th Tweet, and the August 14th Tweet, are false allegations of domestic violence, physical assault, and failure to pay child support.  These false allegations of criminal conduct amount to defamation *per se*.

83.    While ill will or animosity is not equivalent to actual malice, nor required to prove it, evidence of ill will or animosity is highly relevant and admissible to support an inference of actual malice.  E.g., Duffy v. Leading Edge Prods., 44 F.3d 308, n.10 (5th Cir. 1995) ("Although we recognize that proof of ill will or animosity is not required to show actual malice, evidence of ulterior motive can often bolster an inference of actual malice.") (Citation omitted).

84.    Defendant has made numerous public statements demonstrating ill will and animus against Plaintiff, including within *F.L.Y.* and her social media accounts.

85.    As a result of Defendant's defamation of Plaintiff, he has suffered extreme emotional pain, embarrassment, damages to his reputation and good name as well as damages to his career prospects as described herein.

86.    Defendant's false publications achieved their desired effect of exposing Plaintiff to contempt, aversion, and vitriol.  As a direct and proximate result of Defendant's defamatory statements, Plaintiff's personal and professional reputations were damaged, he was unable to secure head coaching positions he interviewed for since August 2020 and his opportunities to interview for and secure head coaching vacancies in the future are in jeopardy.

87.    Plaintiff suffered economic damages as the result of Defendant's defamatory

statements including, but not limited to, millions of dollars in lost salary, loss of employment opportunities, and a diminished ability to market and publicize himself for any number of career opportunities, in both the present day and in the future.

88.    Plaintiff suffered emotional pain and suffering as the result of Defendant's defamatory statements, including the pain and suffering related to his children's having to deal with Defendant's conduct.

89.    Plaintiff is entitled to *per se* damages because the defamatory statements made by Defendant were inherently harmful, in that they addressed criminal conduct, calling into question Plaintiff's morality, integrity and professionalism.

90.    Plaintiff is further entitled to actual damages, compensatory damages, and punitive damages for Defendants' malicious, defamatory conduct, as Plaintiff has been damaged in an amount to be determined at trial.

<u>**AS AND FOR A SECOND CAUSE OF ACTION**</u>
<u>**(Defamation of Character by Libel)**</u>

91.    Plaintiff repeats and realleges each and every allegation above as if fully forth herein.

92.    Defendant posted the August 13th Tweet and the August 14th Tweet with knowledge that the allegations of physical abuse and the allegations that Plaintiff does not pay child support for his children were false.

93.    A review of Defendant's Twitter account reveals further allegations of physical abuse by Plaintiff, some veiled and others directly implicating Plaintiff, including a post by Defendant one day after the August 13th Tweet, on August 14, 2020, in which Defendant posted the following defamatory allegation to her same Twitter account:

a.)    I spent 22+ years keeping the abuse under wraps.  I've lived within the realm

of the nba for 20+ years.  There is no desire for clout from me.  Before breaking my silence I privately went to the NBA and the Raptors in October and November of 2019 about my ex-husband continual abuse and nothing was done.  But enough is enough.  Everyone has their breaking point, and with his recent actions I had to come forward.

94.     The August 14, 2020 Tweet, which appeared on Tweet away from the August 13, 2020 Tweets on Defendant's timeline, is, again, defamatory as the statement is purportedly factually, contains allegations of criminal conduct, Plaintiff's "continual abuse," which Defendant knows to be false.

95.     The false statement posted by Defendant on her public Twitter handle on August 14, 2020, were clearly about Plaintiff as Defendant references her ex-husband, and the team he works for.  Further, Defendant posted the statements, one Tweet after the aforementioned August 13, 2020 Tweet which contained the question "How can someone do ALL of this and get away with it…", which contained the #AdrianGriffin hashtag and tagged reporters from the NBA, including a reporter who covers Plaintiff's team, plus the August 13, 2020 also referenced the "Cinderella" comment made by Plaintiff the evening before.

96.     Defendant, in her Tweet dated August 14, 2020, libeled Plaintiff with non-privileged defamatory false statements of fact that were culpably published and damaging:

a.)     The specific statements accusing Plaintiff of abusing his ex-wife, Defendant, for over "20+ years" (Paragraph 93(a)), are factual: the language used and the context in which that language appears makes clear that Defendant is factually accusing Plaintiff, again, of physically abusing her, committing the crime of assault warranting criminal, domestic violence charges.

b.)     The aforesaid factual statements were false.  Plaintiff never physically abused Defendant as evidenced by her first book outlining their loving, balanced marriage, and the Parties' children immediately coming to his defense on social media after the libelous Tweets on August 13, 2020 and August 14, 2020.

c.)     The aforesaid factual accusations are defamatory *per se* against Plaintiff in

his capacity as a husband, father and coach, as such behavior would not only subject the person to public contempt, aversion, disgrace, induce an evil opinion in the minds of right thinking persons and deprive the person of friendly intercourse in society, but also were defamatory concerning Plaintiff in his performance of his trade and profession as a coach, who is supposed to serve as a mentor and role model to young people, as the face of a billion-dollar sports team.

d.) The aforesaid defamatory and false statements were not privileged, as the communications were not made in the kind of circumstances in which an absolute protection applies or in which it was necessary or appropriate to make those communications subject to a qualified privilege.

e.) The aforesaid non-privileged, defamatory and false statements were culpably uttered. The statements that Plaintiff abused Defendant for "20+ years" during their marriage were made knowing they were false, maliciously and with gross irresponsibility.

f.) The aforesaid non-privileged, defamatory, false and culpably uttered statements were damaging to Plaintiff's abilities to earn a living as a head coach as he was unable to secure the positions he interviewed for and/or otherwise pursued.

97. The false allegations in the August 14, 2020 Tweet, as well as those within the August 13, 2020 Tweet, Defendant's other veiled social media posts and the recently released F.L.Y., are directly fabricated by Defendant, herself.

98. Insofar as she published these defamatory statements with knowledge that they were false, Defendant acted with actual malice.

99. Defendant's allegations, within the August 13th Tweet, and the August 14th Tweet, are false allegations of criminal conduct, domestic violence, physical assault, and failure to pay child support, and therefore amount to defamation *per se*.

100. While ill will or animosity is not equivalent to actual malice, nor required to prove it, evidence of ill will or animosity is highly relevant and admissible to support an inference of actual malice. E.g., <u>Duffy v. Leading Edge Prods</u>., 44 F.3d 308, n.10 (5th Cir. 1995) ("Although we recognize that proof of ill will or animosity is not required to show actual malice, evidence of

ulterior motive can often bolster an inference of actual malice.") (Citation omitted).

101. Defendant has made numerous public statements demonstrating ill will and animus against Plaintiff, including within F.L.Y. and her social media accounts.

102. As a result of Defendant's defamation of Plaintiff, he has suffered extreme emotional pain, embarrassment, damages to his reputation and good name as well as damages to his present and future career prospects as described herein.

103. Defendant's false publications achieved their desired effect of exposing Plaintiff to contempt, aversion, and vitriol. As a direct and proximate result of Defendant's defamatory statements, Plaintiff's personal and professional reputations were damaged, he was unable to secure head coaching positions he interviewed for since August 2020, and his opportunities to interview for and secure head coaching vacancies in the future are in jeopardy.

104. Plaintiff suffered economic damages as the result of Defendant's defamatory statements including, but not limited to, millions of dollars in lost salary, loss of employment opportunities, and a diminished ability to market and publicize himself for any number of present and future career opportunities.

105. Plaintiff suffered emotional pain and suffering as the result of Defendant's defamatory statements, including the pain and suffering related to his children's having to deal with Defendant's conduct.

106. Plaintiff is entitled to *per se* damages because the defamatory statements made by Defendant were inherently harmful, in that they addressed criminal conduct, calling into question Plaintiff's morality, integrity and professionalism.

107. Plaintiff is further entitled to actual damages, compensatory damages, and punitive damages for Defendants' malicious, defamatory conduct, as Plaintiff has been damaged in an

amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this court issue the following for the following relief:

i.  A determination that the information published by Defendant was false and defamatory;

ii.  A determination that Defendant published the defamatory statements with malice;

iii.  An Order directing that Defendant issue a written retraction to each and every person to whom she originally published the false and defamatory statements;

iv.  On the first cause of action for defamation, a judgment awarding the Plaintiff damages in an amount to be determined at trial, but in no event less than $2,500,000.00, plus interest, attorney's fees, expenses, costs and disbursements, as described below:

v.  On the second cause of action for defamation, a judgment awarding the Plaintiff damages in an amount to be determined at trial, but in no event less than $2,500,000.00, plus interest, attorney's fees, expenses, costs and disbursements, as described below:

vi.  An award of per se damages in an amount to be determined at trial, but in no event less than the amount of five hundred thousand dollars ($500,000.00);

vii.  An award of Actual and Compensatory damages in an amount to be determined at trial, but in no event less than the amount of five million dollars ($5,000,000.00);

viii.  An award of Punitive Damages in an amount to be determined at trial, but in no event less than the amount of five hundred thousand dollars ($500,000.00);

ix.  Attorneys' fees as against Defendant, in an amount to be determined at trial.

**Dated:  New York, New York**
        **August 5, 2021**

                     **Respectfully Submitted,**

              **By:** *Andrew T. Miltenberg*

                  **Andrew T. Miltenberg, Esq.**
                  **Nicholas E. Lewis, Esq.**
                  **Nesenoff & Miltenberg, LLP**
                  **363 Seventh Avenue, 5th Floor**
                  **New York, New York 10001**
                  **Telephone: (212) 736-4500**
                  **Facsimile: (212) 736-2260**
                  **amiltenberg@nmllplaw.com**
                  **nlewis@nmllplaw.com**

                  ***Attorneys for Plaintiff***